## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| CHRISTINE G. NELSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 2:19-cv-01545-DCN-MGB |
| | ) | |
| LOCAL 1422, INTERNATIONAL | ) | **ORDER** |
| LONGSHOREMAN'S ASSOCIATION; | ) | |
| and SOUTH CAROLINA STEVEDORES | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter is before the court on Magistrate Judge Mary Gordon Baker's report and recommendation ("R&R"), ECF No. 85, that the court grant defendant South Carolina Stevedores Association's ("SCSA") motion for summary judgment, ECF No. 53; grant defendant Local 1422, International Longshoreman's Association's ("Local 1422," together with SCSA, "defendants") motion for summary judgment, ECF No. 56; and deny plaintiff Christine G. Nelson's ("Nelson") partial motion for summary judgment, ECF No. 59. For the reasons set forth below, the court adopts the R&R and disposes of the motions accordingly.

## I.  BACKGROUND

The International Longshoreman's Association is a union of maritime workers in North America. Local 1422 is a subdivision of the International Longshoreman's Association and serves as the exclusive bargaining unit for longshore workers in the ports of South Carolina. SCSA is a nonprofit trade association that acts as the collective bargaining representative for stevedoring companies who operate in ports of Charleston.

1

Those stevedoring companies hire longshore workers who are members of Local 1422. In other words, SCSA acts as a liaison between stevedoring companies and Local 1422 when it comes to collective bargaining.  In 2018, SCSA and Local 1422 negotiated a collective bargaining agreement ("CBA") that governs their relationship and expires in 2024.  See generally ECF No. 61-1.  The agreement established a Port Grievance Committee (the "PGC"), which was designated to hear "[m]atters under dispute which cannot be promptly settled between" Local 1422 and individual stevedoring companies. Id. at 31 ¶ 15(B).  The PGC is also tasked with handling harassment complaints.  When considering a matter under dispute which cannot be promptly settled, the PGC is to be composed of one member from a company not involved in the dispute, an employer member of SCSA, a union member of Local 1422, and a union member not involved in the dispute.

Nelson is an African American female longshore worker.  Nelson began working as a longshore worker in 2014, and during the relevant period, Nelson performed work for the following stevedoring companies: Ceres Marine Terminals, SSA Cooper a/k/a SSA Atlantic, Marine Terminals Corporation East d/b/a Ports America, and Charleston Stevedoring Company (collectively, the "Port Employers").  Each Port Employer is a member of SCSA.

Although she was not required to join, Nelson also became a member of Local 1422.  According to Nelson, Local 1422 is predominantly male, and there is pervasive sexual harassment toward women at work.  She and other longshore workers have been subjected to degrading and humiliating comments by male co-workers; have been groped,

fondled, or inappropriately touched by male dockworkers; and have experienced other forms of inappropriate behavior.

Nelson alleges three specific incidents of inappropriate touching by male co-workers. Nelson first alleges that at some point prior to March 22, 2017, Dennis Snipe ("Snipe"), a male co-worker, "attempted to rub up against [Nelson's] buttocks" in the union hall where workers must report to get hired. ECF No. 74-1, Nelson Decl. ¶ 20. Then, on March 22, 2017, Snipe allegedly placed his hand on Nelson's upper thigh and touched her inappropriately around her crotch area on the work shuttle that transports longshore workers on and off the ships. Finally, at an unspecified date, David Smalls, a male co-worker, placed his hand next to the seat where Nelson was sitting on the work shuttle so that when Nelson sat down, "his hand was under [her] behind and around the vaginal area." ECF No. 56-3, Nelson Dep. at 125:21–126:5. Three other female workers told Nelson that they experienced similar incidents with Smalls.

Nelson reported the March 22 incident to the PGC, noting that she had also previously experienced a "hostile incident" involving Snipe. ECF No. 60-1 at 1–2. Nelson alleges that on April 8, 2017, Snipe accosted Nelson about filing the grievance letter. On April 11, she submitted a second grievance letter to the PGC regarding the confrontation. Id. at 3–4. On April 14, Kenneth Riley ("Riley") and William Bean ("Bean")—co-chairmen of the PGC—wrote that they were suspending Snipe for thirty days. Id. at 5–6. Nelson claims that following her grievance, the Headers,[1] who are all men, retaliated against Nelson by not selecting her for work. According to Nelson, on the

---

[1] "Headers" are the foreman who choose which longshore workers to hire on behalf of the stevedoring companies that order longshore work from Local 1422. ECF No. 85, R&R at 5 n.6.

days she was not selected for work, the Headers selected less senior longshore workers instead of her, which is a violation of Local 1422's policy.

On May 21, 2017, Nelson claims she met with Riley to discuss the alleged retaliation she was experiencing, although Riley did not recall the meeting. Nelson also allegedly notified Riley about the incident involving Smalls at this meeting. While Riley did not recall the particular meeting, he acknowledged that Nelson told him about Smalls's behavior and he later spoke to Smalls. According to Nelson, Riley took no action following the meeting. On August 7, Nelson called Riley to report that the retaliation was still occurring, including from Melvin Smith ("Smith"), one of the Headers. A few days later, on August 9, 2017, Smith allegedly grabbed Nelson's hand in the union hall and twisted her wrist. Nelson submitted a grievance against Smith to the PGC. After conducting a hearing, the PGC dismissed Nelson's grievance. On October 5, 2017, Smith filed a grievance against Nelson "for creating a hostile work environment and filing false charges." ECF No. 60-4 at 1. After conducting a hearing, the PGC suspended Nelson for thirty days for "making false allegations and representation of the facts." Id. at 4.

As a result of those events, Nelson began treatment for depression, post-traumatic stress disorder, panic disorder, and insomnia. She alleges that she was also treated for the injury to her wrist. When Nelson returned to work on July 12, 2018, she requested that she be allowed to ride in the front seat of the work shuttle based on the recommendation of her psychiatrist. Initially, the Local 1422 chief delegate allowed Nelson to ride in the front of the work shuttle, but according to Nelson, once Bean learned about the accommodations, he emailed the chief delegate and instructed him to not allow Nelson to

work for safety reasons.  Riley confirmed his co-chairman's decision.  As a result, Nelson was out of work for 198 days, which she claims was effectively a suspension.  She returned to work on February 14, 2019.  Nelson claims that as a result of her suspension, she lost her income, health insurance, and other financial benefits, and she suffered tremendous emotional difficulties.

On May 28, 2019, Nelson filed the instant action against defendants.  Pursuant to 28 U.S.C. §§ 636(b)(1)(A) and (B) and Local Civil Rule 73.02(B)(2)(g) (D.S.C), all pretrial proceedings in this case were referred to Magistrate Judge Baker.  On October 16, 2019, Nelson filed an amended complaint, now the operative complaint, alleging harassment, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII").  ECF No. 16, Amend. Compl.

On June 3, 2021, SCSA filed its motion for summary judgment.  ECF No. 53.  On July 9, 2021, Nelson filed an incomplete response, ECF No. 68, and the magistrate judge granted leave to file an amended response, ECF No. 73.  Nelson filed the amended response on July 19, 2021, ECF No. 74, and SCSA replied on August 12, 2021, ECF No. 80.  On June 3, 2021, Local 1422 filed its motion for summary judgment.  ECF No. 56.  Nelson filed her amended response on July 19, 2021, ECF No. 74, and Local 1422 replied on August 12, 2021, ECF No. 81.  On June 3, 2021, Nelson filed her partial[2] motion for summary judgment.  SCSA responded in opposition on July 9, 2021, ECF No. 66, and Nelson replied on July 16, 2021, ECF No. 70.  Local 1422 responded in opposition on July 9, 2021, ECF No. 67, and Nelson replied on July 16, 2021, ECF No.

---

[2] This motion was styled as a motion for summary judgment, but as the R&R noted, the motion only seeks summary judgment in Nelson's favor on her retaliation and discrimination claims and on the issue of joint employment.  ECF No. 85 at 1 n.1.

5

71.  On September 22, 2021, Magistrate Judge Baker issued the R&R, recommending that the court grant SCSA and Local 1422's motions for summary judgment and deny Nelson's partial motion for summary judgment.  ECF No. 85.  On October 21, 2021, Nelson filed her objections to the R&R.  ECF No. 89.  Both Local 1422 and SCSA individually responded to the objections on December 2, 2021.  ECF Nos. 95–96.  Nelson did not file a reply, and the time to do so has now expired.[3]  As such, the matter is now ripe for the court's review.

## II.  STANDARD

This court is charged with conducting a de novo review of any portion of the Magistrate Judge's R&R to which specific, written objections are made.  28 U.S.C. § 636(b)(1).  A party's failure to object is accepted as agreement with the conclusions of the Magistrate Judge.  See Thomas v. Arn, 474 U.S. 140, 149–50 (1985).  The recommendation of the Magistrate Judge carries no presumptive weight, and the responsibility to make a final determination rests with this court.  Mathews v. Weber, 423 U.S. 261, 270–71 (1976).  The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge . . . or recommit the matter to the magistrate judge with instructions."  28 U.S.C. § 636(b)(1).  The court is charged with making a de novo determination of any portion of the R&R to which a specific objection is made.  Id.  However, in the absence of a timely filed, specific objection, the court reviews the R&R only for clear error.  Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005) (citation omitted).  Furthermore,

---

[3] On December 6, 2021, Nelson filed a motion for oral argument.  ECF No. 97. The court finds that the motions are capable of resolution without a hearing and denies Nelson's motion.

"[a] party's general objections are not sufficient to challenge a magistrate judge's findings." Greene v. Quest Diagnostics Clinical Labs., Inc., 455 F. Supp. 2d 483, 488 (D.S.C. 2006) (citation omitted).  When a party's objections are directed to strictly legal issues "and no factual issues are challenged, de novo review of the record may be dispensed with." Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982) (citation omitted). Analogously, de novo review is unnecessary when a party makes general and conclusory objections without directing a court's attention to a specific error in a magistrate judge's proposed findings. Id.

Summary judgment shall be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249.  The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor.  Id. at 255.

### III.  DISCUSSION

Nelson, SCSA, and Local 1422 each filed separate motions for summary judgment.  Nelson moved for summary judgment in her favor on her discrimination and retaliation claims, and on the finding that Nelson is jointly employed by Local 1422 and SCSA.  SCSA moved for summary judgment on all claims, arguing that (1) SCSA is not an "employer" under Title VII, (2) SCSA is not Nelson's "joint employer," (3) Nelson failed to establish a prima facie case for her harassment or hostile work environment claims, and (4) Nelson failed to establish a prima facie case for her retaliation claim. Local 1422 similarly moved for summary judgment on all claims, arguing that (1) Nelson has not exhausted her administrative remedies for certain claims, (2) Local 1422 is not liable under Title VII as a joint employer or under a theory of vicarious liability, (3) Local 1422 did not retaliate against Nelson, and (4) Nelson is not liable for a hostile work environment claim.  The Magistrate Judge recommended that the court deny Nelson's motion for summary judgment and grant defendants' motions for summary judgment. The R&R reached this recommendation by aggregating the parties' arguments and determining that (1) Local 1422 and SCSA are not Nelson's joint employers, (2) Nelson's discrimination claim fails on the merits, (3) Nelson's hostile work environment claim fails on the merits, (4) Nelson's retaliation claim fails on the merits, and (5) Local 1422 is not liable as a labor union.  Nelson objects to each of the R&R's conclusions.  The court considers Nelson's objections under each of the R&R's conclusions, ultimately overruling each objection and granting summary judgment in defendants' favor on all claims.

### A.  Joint Employer Liability

"Title VII . . . proscribe[s] discrimination by 'employer[s],' 'employment agenc[ies],' and 'labor organization[s].'"  E.E.O.C. v. Seafarers Int'l Union, 394 F.3d 197, 204 (4th Cir. 2005) (quoting 42 U.S.C. § 2000e–2(a)–(c); 29 U.S.C. § 623(a)–(c)).  Nelson's complaint primarily asserts that defendants are liable as employers.  Title VII defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person."  42 U.S.C. § 2000e(b).  Title VII's definition of "employer" is to be liberally construed.  Baker v. Stuart Broad. Co., 560 F.2d 389, 391 (8th Cir. 1977).

Nelson specifically claims that SCSA and Local 1422 are joint employers of Nelson such that they are both liable.  Two parties can be considered joint employers and therefore both be liable under Title VII if they "exercise[] significant control over the same employees."  Butler v. Drive Auto. Indus. of Am., Inc., 793 F.3d 404, 410 (4th Cir. 2015) (quoting Bristol v. Bd. of Cnty. Comm'rs, 312 F.3d 1213, 1218 (10th Cir. 2002)).  To determine the extent to which an employer "controls" an employee, the Fourth Circuit applies a list of nine factors under a "hybrid" test.  Id. at 412–13.  Those factors are:

> (1)  authority to hire and fire the individual;
> (2)  day-to-day supervision of the individual, including employee discipline;
> (3)  whether the putative employer furnishes the equipment used and the place of work;
> (4)  possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;
> (5)  the length of time during which the individual has worked for the putative employer;
> (6)  whether the putative employer provides the individual with formal or informal training;
> (7)  whether the individual's duties are akin to a regular employee's duties;
> (8)  whether the individual is assigned solely to the putative employer; and

(9) whether the individual and putative employer intended to enter into an employment relationship.

Id. at 414.  Of these factors, the first three "are the most important."  Id.  However, when applying the joint employment factors, "no one factor is determinative, and the consideration of factors must relate to the particular relationship under consideration." Id. (citing Cilecek v. Inova Health Sys. Servs., 115 F.3d 256, 261 (4th Cir. 1997)).

The R&R found that defendants are not joint employers of Nelson based on the first, second, third, fourth, and sixth factors.  Nelson objects to the R&R's conclusions on each factor, and the court considers each of the disputed factors in turn.

## 1. Authority to Hire and Fire

### a. Local 1422

Under the first factor, the R&R concluded that defendants "do not have authority to hire or fire Plaintiff."  R&R at 13.  Nelson objects to the conclusion as it relates to both Local 1422 and SCSA, arguing first that Local 1422 effectively hires individuals because it "operates a 'hiring hall' through which it funnels work to the stevedoring companies associated with SCSA on a day-to-day basis."  ECF No. 89 at 4 (citing Local 1422, Int'l Longshoremen's Ass'n v. S.C. Stevedores Ass'n, 170 F.3d 407, 408 (4th Cir. 1999)). However, none of the cases that Nelson cites analyzed whether a union that operates a hiring hall is an employer under Title VII.  Rather, the issue in each of those cases was whether a union operating a hiring hall owes a duty of fair representation independent of or arising from its duty to represent the employees in its bargaining unit.  See, e.g., Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6, 493 U.S. 67, 86–87

(1989) (describing duty of fair representation claim).[4]  Perhaps most critically, the

Supreme Court in <u>Breininger</u> <u>rejected</u> an attempt to analogize unions that operated hiring

halls to employers.  <u>Id.</u> at 87–88 ("[R]espondent insists that petitioner has failed to state a

claim because in the hiring hall setting a union is acting essentially as an employer in

matching up job requests with available personnel . . . . We cannot accept this proposed

analogy.").

      In the absence of any controlling law indicating that unions operating hiring halls

are employers <u>ipso facto</u>, the court turns to the R&R's application of the facts.  In

Nelson's motion for summary judgment and her responses in opposition to defendants'

motions, Nelson argued that the Headers—who were responsible for choosing which

longshore workers to hire at the hiring hall—were selected by Local 1422.  The R&R

determined that none of the evidence that Nelson cited demonstrated that Local 1422 had

exclusive authority to select Headers.  Rather, the R&R concluded that the testimony

indicated that the Port Employers made the final decision as to who would be selected.

In her objection, Nelson merely restates her argument that Headers are selected by Local

1422 but ignores the evidence examined by the R&R.  Nelson also cites to the CBA, but

the section cited by Nelson belies, rather than supports, her argument.  Under its rules on

---

[4] Nelson would also have the court apply <u>Breininger</u> as indirect authority for determining that unions that operate hiring halls act in a hiring capacity.  Nelson argues that according to the Supreme Court, "when a union operates a hiring hall it 'wield[s] additional power in a hiring hall by assuming the employer's role, its responsibility to exercise that power fairly increases rather than decreases.'"  ECF No. 89 at 5 (quoting <u>Breininger</u>, 493 U.S. at 89.  However, Nelson leaves out a critical word from the Supreme Court's opinion.  The Court wrote "<u>IF</u> a union does wield additional power in a hiring hall . . ."; it was not issuing a blanket rule that all such unions have increased responsibilities.  <u>Id.</u> (emphasis added).  Moreover, the Court followed the sentence by noting that the inquiry was relevant for duty of fair representation cases, as discussed above.

hiring longshoremen or longshorewomen, the collective bargaining agreement specifies that "[g]angs shall continue to be hired by the employer in accordance with local custom." ECF No. 61-1 at 92 § 7(a)(1). The term "employer" in the CBA refers to the Port Employers. See id. at 8 § 1. Based on the evidence, a reasonable juror could not conclude that Local 1422 had authority to hire longshoremen such that it was a joint employer.

The R&R also found that Local 1422 had no authority to fire employees because only the Port Employers had authority to do so. In her objections, Nelson argues that the R&R failed to consider the fact that Headers have authority to immediately fire a longshore worker upon a determination that he or she violated the rules. Additionally, Nelson argues that Walking Bosses[5] have the authority to terminate any worker assigned to a vessel. However, Nelson's objections fail to address the R&R's underlying determination: that none of the evidence suggested Local 1422 had exclusive authority to select Headers and Walking Bosses in the first place. Rather, the CBA provides that while it "is incumbent on the Employer to consider the Union's suggestions" on the selection of the Headers, it is ultimately the Port Employer's place to designate Headers agreeable to the parties. Id. at 20 § 13(C). The same is true for Walking Bosses. Id. at 124 ("The Walking Boss will be chosen in accordance with Section 13(C) . . . ."). Even if Local 1422 had input on the Headers and Walking Bosses, the court finds that this factor is outweighed by the others, including Local 1422's lack of authority in hiring.

---

[5] "Walking Bosses" oversee the longshoremen working on the docks. R&R at 14 at n.12.

Finally, Nelson argues in her motion for summary judgment, response to defendants' motions, and objections to the R&R that Local 1422 and SCSA are members of several committees, including the PGC, that have the authority to terminate workers like Nelson.  This argument was raised and considered in the R&R, and as the Magistrate Judge explained, defendants are joined by the Port Employers on the committees, and the committees must agree on the decision before any disciplinary action is taken.  Moreover, the R&R observed that the existing caselaw was notably one-sided for finding that disciplinary authority exercised by a union is derived from its role as a collective bargaining agent, not due to its control over its members.  See Ryals v. ILA Local 1771, 33 F. Supp. 3d 634, 641 (D.S.C. 2014).  Nelson argues that Ryals is inapplicable because it was issued before the Fourth Circuit adopted the Butler hybrid test, but that distinction was noted by the R&R.  See R&R at 15 ("Though Ryals is factually distinct, the cited proposition suggests that a union like Defendant Local 1422 should not be considered a plaintiff's joint employer because it does not maintain requisite control.").  The court similarly finds that Ryals is instructive on the issue of control, which the Fourth Circuit has stated is the "principal guidepost" in the joint employer analysis.  Butler, 793 F.3d at 414.  Accordingly, the court finds that Local 1422 did not have hiring or firing authority.

### b.  SCSA

The R&R also determined, for similar reasons, that SCSA lacked hiring or firing authority.  Additionally, the R&R cited, but did not rely on, a case where the Northern District of California determined that a trade association is not an employer of longshore workers.  See Lewis v. Pac. Mar. Ass'n, 2007 WL 2429554, at *12 (N.D. Cal. Aug. 24, 2007).  Nelson argues in her objections that Lewis has been abrogated by another case

from the Western District of Washington.  ECF No. 89 at 10 (citing Ross v. Pac. Mar.

Ass'n, 2020 U.S. Dist. LEXIS 116857 (W.D. Wash. July 2, 2020)).  According to

Nelson, the court in Ross determined that the very same defendant in Lewis, a trade

association, was a joint employer.  However, Nelson's reliance on Ross is misplaced.

The very nature of the hybrid test dictates that one court's conclusion based on the set of

facts before it will not be the same as another court's conclusion.  See Buter, 793 F.3d at

415 (noting that the purpose of the hybrid test is to pierce the formalities of determining

an employment relationship while not discounting those formalities entirely).  Based on

the facts, Ross is distinguishable because there, the trade association was more directly

involved with the dispatch of longshore workers at the hiring hall.[6]  Applying the facts

here, the Magistrate Judge properly found that SCSA's involvement in hiring and firing

decisions was minimal.  Nelson fails to raise any other objections unique to SCSA, and

accordingly, the court finds that SCSA did not have hiring or firing authority for purposes

of the control test.

### 2.  Day-to-Day Supervision

The R&R next determined that neither Local 1422 nor SCSA supervised the

longshore workers on a daily basis.  Nelson objects to the R&R's conclusion, arguing that

the Magistrate Judge failed to account for the fact that longshore workers are supervised

by Headers and Walking Bosses.  The court has already addressed the underlying premise

behind this argument—that Headers and Walking Bosses are selected by Local 1422—

---

[6] This fact is not directly referenced in the court's order but is discussed in the plaintiff's brief.  See Plaintiff's Opposition to Defendant PMA's Renewed Motion for Partial Summary Judgment at 4, Ross v. Pac. Mar. Ass'n, No. 2:19-cv-01676 (W.D. Wash. 2020) (ECF No. 94).

and overrules this objection.  Additionally, Nelson argues that SCSA supervises Nelson because Bean, the executive director of SCSA, supervises longshore workers by virtue of being a member of the Safety Review Board ("SRB").  The SRB imposes penalties for accidents and safety violations, and it may issue disciplinary action.  Nelson appears to be presenting arguments about Bean's involvement on the SRB for the first time in her objections.  Nelson's argument is untimely, and the court may overrule it on that ground alone.  See Addison v. CMH Homes, Inc., 47 F. Supp. 3d 404, 412 (D.S.C. 2014) (stating the court has no obligation to consider new arguments a party raises for the first time in her objections to an R&R).  Moreover, while the Magistrate Judge did not consider Bean's membership on the SRB because it was not raised earlier, the R&R noted that participation on the PGC is insufficient to establish defendants' supervisory capacity. The same reasoning applies to membership on the SRB: ultimately, Bean could not dictate the decision-making of the SRB by himself, and the SRB's structure is inconsistent with the notion that SCSA exercised control over Nelson.  The court therefore finds that defendants did not supervise Nelson such that they were her joint employers.

### 3.  Equipment and Place of Work

Under the third factor, the R&R found that the Port Employers dictated the location where Nelson worked and furnished any equipment that Nelson needed to perform her job duties.  Nelson objects to this finding, arguing that each longshore worker's location is based on where the Header, as the foreman, is working.  However, Nelson ignores that this factor looks at whether "the putative employer furnishes . . . the place of work," not whether it is selected by the putative worker.  Butler, 793 F.3d at 414

(emphasis added).  If not furnished and owned by the Port Employers, the ships and docks were certainly not furnished or owned by defendants.  Furthermore, for reasons discussed above, the court does not find that Headers are proxies for Local 1422.  With respect to SCSA, Nelson argues that the Magistrate Judge erroneously stated that SCSA only provides training, safety equipment, and radios.  Nelson's objection appears to be incomplete.  After reproducing the testimony from where the R&R drew that information, Nelson does not explain what other equipment SCSA provides other than what is stated in Bean's deposition.  See ECF No 89 at 14.  The court overrules Nelson's objections under this factor.

### 4.  Possession and Responsibility Over Employment Records

Under the fourth factor, the R&R acknowledges that defendants "keep some administrative records in their respective offices."  R&R at 13.  However, the R&R determined that the Port Employers are ultimately responsible for handling Nelson's payroll, insurance, and taxes.  Moreover, the Port Employers were the ones who paid Nelson for her work on the docks and made decisions regarding any worker's compensation claims and requests for work accommodations.  Nelson objects to the R&R's conclusion, arguing that she performed work directly for Local 1422, they paid her for that work, and she received paychecks and W2 forms directly from Local 1422.  In its response to the objections, Local 1422 does not dispute that Nelson performed non-longshore work for Local 1422.  It argues, however, that neither Nelson's charges to the Equal Employment Opportunity Commission ("EEOC") against Local 1422 nor her complaint in the instant action alleged any claims under Title VII for how she was treated while performing work for Local 1422 independently.  Rather, her claims arise from how

she alleges she was treated while performing work for the Port Employers. The court agrees. The joint employer test is intended to recognize "the reality of changes in modern employment," where a growing number of workers are increasingly working for multiple employers. Butler, 793 F.3d at 410. To find that an "employer" in one context must assume liability for the wrongful discrimination of another employer would mean "affixing a label to a person that does not capture the substance of the employment relationship." Id. (quoting Schwieger v. Farm Bureau Ins. Co. of Neb., 207 F.3d 480, 484 (8th Cir. 2000)). The court finds that based on this factor, the Port Employers were "employers" as it related to Nelson's longshore work from which her claims stem.

### 5. Formal and Informal Training

Under the sixth factor, Nelson argues that the Magistrate Judge erred by finding that the Port Employers have final say on when, where, and how any training occurs. Once again, Nelson's objections appear incomplete. After Nelson stated her objection in the subheading, no argument or further explanation follow. See ECF No. 89 at 14. The court overrules the objection.

Finally, under the eighth and ninth factors, the R&R briefly noted that there was no evidence in the record that Nelson was assigned to or intended to create an employer-employee relationship. Nelson does not object to the Magistrate Judge's conclusion, and the court finds no clear error in the same. After looking to each of the individual factors, particularly the first three factors, the court finds that no reasonable juror could find that Local 1422 and SCSA were joint employers. Even under the totality of the circumstances, the court finds that defendants did not exercise requisite control. Therefore, Nelson fails to ascribe liability to defendants under Title VII, and for that

reason, the court denies Nelson's motion for partial summary judgment, grants Local

1422's motion for summary judgment, and grants SCSA's motion for summary

judgment.

### B.  Union Liability

Nelson argues that if Local 1422 is not liable as a joint employer, it is liable as a

labor organization.  "Liability under Title VII applies to labor organizations."  E.E.O.C.

v. Reynolds Metals Co., 212 F. Supp. 2d 530, 539 (E.D. Va. 2002) (citing Donnell v.

Gen. Motors Corp., 576 F.2d 1292, 1300 (8th Cir. 1978)).  Title VII provides:

> It shall be an unlawful employment practice for a labor organization--
>
> > (1) to exclude or to expel from its membership, or otherwise to
> > discriminate against, any individual because of his race, color,
> > religion, sex, or national origin;
> >
> > (2) to limit, segregate, or classify its membership or applicants for
> > membership, or to classify or fail or refuse to refer for employment
> > any individual, in any way which would deprive or tend to deprive
> > any individual of employment opportunities, or would limit such
> > employment opportunities or otherwise adversely affect his status as
> > an employee or as an applicant for employment, because of such
> > individual's race, color, religion, sex, or national origin; or
> >
> > (3) to cause or attempt to cause an employer to discriminate against
> > an individual in violation of this section.

42 U.S.C. § 2000e–2(c).  Although it was unclear from her prior briefs, and the R&R thus

considered each of the three subsections, Nelson's objections now suggest that she is

claiming a violation of subsection 2(c)(1).  See ECF No. 89 at 37 ("Under Title VII,

Unions, like employers, may not discriminate based upon an impermissible

consideration. 42 U.S.C. § 2000e-2(c)(1) . . . .").  "Under Subsection 2(c)(1), a labor

union can be liable where it directly engages in discrimination by, for example,

deliberately refusing to pursue a sexual harassment grievance on behalf of a plaintiff."

<u>Wiggins v. SSA Atl., LLC</u>, 2020 WL 6218804, at *4 (D.S.C. Aug. 27, 2020), <u>report and recommendation adopted</u>, 2020 WL 5810413 (D.S.C. Sept. 30, 2020).  Specifically, to establish a Title VII sex discrimination claim against a union, an employee must show that: (1) the employer violated the collective bargaining agreement with respect to the employee; (2) the union breached its duty of fair representation by allowing the breach to go unrepaired; and (3) there is some evidence of gender animus among the union. <u>Greenslade v. Chi. Sun-Times, Inc.</u>, 112 F.3d 853, 866 (7th Cir. 1997).

Nelson raises only one specific objection, which is that Local 1422 is liable because they violated the CBA with respect to Nelson.  Specifically, Nelson avers that the CBA requires Local 1422 and SCSA to investigate Nelson's claim against Smith, including by speaking to witnesses.[7]  Assuming, without deciding, that Nelson has established a violation of the CBA, she has still failed to prove the other elements for a union discrimination claim.  For instance, although Nelson references the duty of representation, she has set forth no evidence that "its decision not to pursue a grievance [or investigation] is arbitrary or based on discriminatory or bad faith motives." <u>Greenslade</u>, 112 F.3d at 867.  Indeed, under the broader subsection 2(c)(3), "a union 'has no affirmative duty under Title VII to investigate and take steps to remedy employer discrimination.'"  <u>Wiggins</u>, 2020 WL 6218804, at *4 (quoting <u>Eliserio v. United Steelworkers of Am. Local 310</u>, 398 F.3d 1071, 1076 (8th Cir. 2005)).  It follows that such evidence is insufficient to show a breach of the duty of representation.  Finally,

---

[7] In support, Nelson cites ECF No. 56-16, which appears to be a collective bargaining agreement between another negotiating committee and union.  <u>See</u> ECF No. 56-16 at 4.  The court has also failed to identify the quotation that Nelson attributes to page 110 of the exhibit.  In any case, consideration of the exhibit is not material as the court acknowledges that the CBA at issue here contains a similar requirement.

Nelson has presented no evidence that defendants' failure to fully investigate Nelson's claim was itself motivated by gender animus. The court overrules Nelson's objections and finds that Local 1422 is not liable as a labor organization under Title VII.

## C. Discrimination

Coupled with the Magistrate Judge's conclusion that Local 1422 is not liable as a union, the R&R could have ended its analysis and found summary judgment appropriate in defendants' favor based on its finding that defendants are not joint employers and are therefore not liable under Title VII. Nevertheless, the R&R proceeded to the merits of Nelson's claims and found that assuming arguendo that defendants were joint employers, summary judgment in defendants' favor was warranted on Nelson's discrimination, hostile work environment, and retaliation claims. The court follows the R&R's approach by considering the merits of each claim, starting with Nelson's discrimination claim.

The R&R recommended that the court dismiss Nelson's discrimination claim because Nelson has not exhausted her administrative remedies. Before an employee may sue her employer under Title VII in federal court, the employee must first exhaust her administrative remedies. Smith v. First Union Nat'l Bank, 202 F.3d 234, 247 (4th Cir. 2000). Specifically, a claimant is required to file a charge of discrimination with the EEOC within 180 days of the alleged discriminatory act(s), or, if the alleged discrimination occurred in a deferral state, within 300 days from the alleged discriminatory act(s) if claimant institutes proceedings with the appropriate state agency. See 42 U.S.C. § 2000e–5(e). In determining the scope of a plaintiff's exhausted claims, the court is bound by the scope of the plaintiff's claims as are set forth in her administrative charge, and only those discrimination claims set forth in the administrative

charge, reasonably related thereto, or which were developed by a reasonable investigation of the claims set forth in the original charge may be maintained in a subsequent Title VII lawsuit.  Bryant v. Bell Atlantic MD., Inc., 288 F.3d 124, 132 (4th Cir. 2002); Evans v. Techs. Applications & Serv., Co., 80 F.3d 954, 963 (4th Cir. 1996); Jones v. Calvert Grp., Ltd., 551 F.3d 297, 300 (4th Cir. 2009), abrogated on other grounds by Fort Bend Cnty v. Davis, 139 S. Ct. 1843 (2019) ("Allowing a complaint to encompass allegations outside the ambit of the predicate [administrative] charge would circumscribe [the administrative agency's] investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely . . . charge").

The R&R stated that Nelson filed two charges with the EEOC before filing the instant action.  The R&R further observed that these EEOC charges alleged discrimination through claims regarding a hostile work environment and retaliation.  Notably, those charges did not raise Nelson's claim that women are prohibited from performing certain types of dock work.  As the R&R noted, it was not until Nelson's response to defendants' motions for summary judgment that Nelson raised the factual allegation, for the first time, that Local 1422 had a policy preventing women from being hired to perform certain lashing jobs that required heavy chains.  Since the R&R concluded that Nelson's newly-asserted discrimination claim was not reasonably related to her EEOC charges, the R&R recommended that the court dismiss the claim for failure to exhaust.  Nelson objects to the R&R's recommendation in two respects.  First, she argues that she exhausted her administrative remedies.  Specifically, Nelson claims that she filed four separate charges, not two, with the EEOC.  The court agrees that based on

21

the record, Nelson filed four charges, on December 19, 2017, February 14, 2018, August 9, 2018, and November 16, 2018.  However, upon a de novo review, the court finds that it is still the case that none of the charges raised Nelson's claim that Local 1422 prevented women from being selected for jobs involving heavy chains.  For example, the R&R overlooked the charge filed on August 9, 2018, but that charge did not describe any policy of discrimination; rather, the allegations therein focused on the hostile work environment and retaliation that resulted from her prior charge.  Nelson also argues that her amended complaint referenced discrimination by alleging that "Plaintiff and other female longshore workers are regularly harassed and groped.  Additionally, they are passed over for the sought-after assignments."  Amend. Compl. ¶ 29.  Setting aside that this does not alter the court's conclusion that the claim was not advanced in the EEOC charges, such an allegation may not substitute for a fully-fledged factual assertion about a discriminatory policy of prohibiting women from working on jobs involving chains.  See Harris v. Reston Hosp. Ctr., LLC, 2012 WL 1080990, at *4 (E.D. Va. Mar. 26, 2012), aff'd, 523 F. App'x 938 (4th Cir. 2013) ("Plaintiff cannot assert a new legal theory for the first time in opposing Defendant's Motion for Summary Judgment because this would amount to a constructive amendment of the Complaint and would unfairly prejudice Defendant.").  Since Nelson's claim of discrimination regarding selection for certain jobs did not appear in Nelson's administrative charges, let alone her amended complaint, the court finds that Nelson failed to administratively exhaust her remedies.

Second, Nelson argues that there is an exception to the exhaustion rule where "a Title VII plaintiff may raise a retaliation claim for the first time in federal court without exhausting her administrative remedies if the discrimination complained of is 'like or

related to allegations contained in the charge and growing out of such allegations during the pendency of the case before the Commission.'" Mezu v. Morgan State Univ., 367 F. App'x 385, 389 (4th 2010) (quoting Nealon v. Stone, 958 F.2d 584, 590 (4th Cir. 1992)). While these are the types of arguments that are properly raised in objections to an R&R, the court finds that Nelson is attempting to apply the reverse of the holding from Mezu in this case. The court in Mezu determined that the plaintiff could assert a retaliation claim by attaching that claim to a timely-asserted discrimination claim. Id. Here, Nelson is attempting to attach a discrimination claim to a previously-asserted retaliation claim. A retaliation claim may be attached to an administratively-exhausted discrimination claim, but the opposite may not be true because the statute requires the claimant to file a charge of discrimination within 180 days. See 42 U.S.C. § 2000e–5(e). Finally, the Fourth Circuit's finding in Mezu was premised on the underlying notion that courts should flexibly allow "like or related allegations contained in the charge" to continue in federal court. Nealon, 958 F.2d at 590. As the court discussed above, there is de minimis mention of discriminatory policies in the EEOC charges, and as such, the court grants summary judgment on Nelson's discrimination claims.

### D. Hostile Work Environment

The R&R next recommended that the court grant summary judgment in defendants' favor on Nelson's hostile work environment claim under Title VII. To establish a hostile work environment under Title VII, Nelson must show that (1) "she experienced unwelcome harassment," (2) "the harassment was based on her gender, race, or age," (3) "the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere," and (4) "there is some basis for

imposing liability on the employer." Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003). Defendants moved for summary judgment, arguing that Nelson had failed to establish the fourth element—that there was a basis for imposing liability upon them. Although Nelson did not move for summary judgment on this claim, she responded in opposition that Local 1422 created and cultivated a hostile work environment.

The R&R first observed that Nelson failed to address SCSA's role in creating a hostile work environment. The R&R thus considered the claim against SCSA to be abandoned and recommended that the court grant summary judgment in SCSA's favor. Nelson does not object to that recommendation, and the court therefore reviews the same for clear error. Finding none, the court adopts the R&R in this respect and grants summary judgment in SCSA's favor on Nelson's hostile work environment claim— again, to the extent that claim is actionable based on SCSA's liability as a joint employer.

Next, the R&R concluded that for each of the instances of harassment, Local 1422 either did not know of it or had already taken effective action by responding. An employer is liable "for hostile work environments created by co-workers and third parties 'if it knew or should have known about the harassment and failed to take effective action to stop it . . . [by] respond[ing] with remedial action reasonably calculated to end the harassment.'" Pryor v. United Air Lines, Inc., 791 F.3d 488, 498 (4th Cir. 2015) (quoting E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 319 (4th Cir. 2008)) (alterations in original). In reaching this conclusion, the R&R proceeded through the timeline of events as represented by Nelson and found that Riley, Local 1422's representative on the PGC, either spoke to the individual accused of harassment (as in the case of Snipe and Smalls),

24

disciplined that individual via the PGC (in the case of Snipe), or did not know about the harassment (in the case of Nelson's other general complaints of a hostile work environment).

In objecting to this finding in the R&R, Nelson restates the same arguments she made in her opposition to summary judgment. She again argues that over multiple years, (1) Nelson was sexually assaulted on two separate occasions in the back seat of the work shuttle; (2) male dock workers frequently made offensive comments about women and their bodies; and (3) male dockworkers often played videos loudly on their cellphones of people engaging in sexual intercourse and discussed their sexual exploits while riding in the work shuttle. She also points again to the fact that Nelson informed Riley that Smalls had touched her inappropriately and that other women had experienced the same behavior. In her objections, Nelson argues that the R&R failed to consider that an employer is liable under a mere negligence standard if they knew or should have known about the conduct and failed to stop it. The court disagrees with Nelson's assertion that the R&R failed to consider these facts. The court finds that the R&R properly considered and discussed these facts, stated the relevant law, referenced decisions of comparable cases, and properly applied the law to Nelson's case. The court need not repeat that analysis here and adopts the R&R's conclusion that Nelson failed to establish the third element of her hostile work environment claim.

### E.  Retaliation

Title VII forbids an employer from taking action that discriminates against an employee because that employee either has "opposed any practice made an unlawful employment practice" by Title VII or has "made a charge, testified, assisted, or

participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e–3(a). The purpose of the anti-retaliation provision is to prevent "an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 63 (2006). A plaintiff may avoid summary judgment on a retaliation claim through two avenues of proof: by presenting direct evidence of retaliatory animus or by relying on the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Roberts v. Glenn Indus. Grp., Inc., 998 F.3d 111, 122 (4th Cir. 2021); Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 249 (4th Cir. 2015). The Magistrate Judge concluded in the R&R that Nelson did not produce direct evidence of retaliation and likewise failed to meet her burden under the McDonnell Douglas burden-shifting framework. Nelson only objects to the court's analysis under the burden-shifting framework, and the court thus only analyzes that issue.

To prevail under the McDonnell Douglas framework, a plaintiff must first establish a prima facie case of retaliation. Roberts, 998 F.3d at 122. If she establishes a prima facie case, the burden shifts to the employer to show that it took adverse action for a legitimate, non-retaliatory reason. Id. If the employer provides such reasons, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported non-retaliatory reasons were pretext for retaliation. Id.

To establish a prima facie case of retaliation, Nelson must present evidence showing that (1) she engaged in a protected activity, (2) her employer acted adversely against her, and (3) there was a causal connection between the protected activity and the asserted adverse action. Hoyle v. Freightliner, LLC, 650 F.3d 321, 337 (4th Cir. 2011).

26

An adverse action is one that "well might have dissuaded a reasonable worker" from engaging in protected conduct. Burlington N., 548 U.S. at 68 (internal quotation marks and citation omitted); see Ray v. Int'l Paper Co., 909 F.3d 661, 670 (4th Cir. 2018) ("[A]lthough an adverse action need not affect the terms and conditions of employment, there must be some direct or indirect impact on an individual's employment as opposed to harms immaterially related to it.") (internal quotation marks and citation omitted).

In her complaint, Nelson alleges three acts of retaliation involving various decisionmakers. The Magistrate Judge evaluated each act in the R&R, ultimately concluding that none of the acts served as a proper ground for a retaliation claim. Because defendants did not dispute in their summary judgment motions that Nelson engaged in protected activity, this conclusion in the R&R turned on two issues. The first issue was whether Nelson demonstrated a causal connection between filing her complaints and the adverse employment actions about which she complains. The second issue was whether Nelson produced sufficient evidence to show that defendant's articulated legitimate, non-retaliatory reasons for the alleged adverse actions were merely pretext for retaliation. The court analyzes each purportedly retaliatory act in turn.

### 1. Thirty-Day Suspension

As discussed earlier, after Nelson filed her grievance against Smith for allegedly grabbing and twisting her wrist, the PGC conducted a hearing and voted to dismiss the charges. When Smith subsequently filed his own grievance, the PGC suspended Nelson for thirty days following a hearing. Nelson alleges that the thirty-day suspension was retaliation for filing a grievance against Smith.

As a preliminary matter, the R&R determined that the PGC made the decision to suspend Nelson, not defendants. Since the PGC includes representatives from Local 1422, SCSA, and the Port Employers, the R&R determined that Nelson's claim that defendants retaliated by suspending her was dubious on this ground alone. In her objections, Nelson argues that "the PGC is made-up entirely of men, none of whom know what it is like to be a woman working in a male driven industry," that the committee is made up of officers and high-ranking members of Local 1422 and SCSA, and that Bean is the co-chair of the PGC. However, none of these factual assertions alter the R&R's conclusion that the retaliatory act of the PGC cannot be imputed on defendants, and the court adopts the R&R's conclusion in this respect.

Moving past the issue of imputable liability, the R&R determined that Nelson had provided sufficient evidence of causation as it relates to the thirty-day suspension. Defendants do not object to the Magistrate Judge's conclusion. The court therefore adopts the R&R's conclusion that Nelson set forth a prima facie case of retaliation based on the thirty-day suspension. However, the R&R determined that the PGC offered a legitimate, non-retaliatory reason for the suspension by explaining that it concluded that Nelson had filed a false complaint against Smith. Nelson argues, as she did in her motion for summary judgment and response in opposition to defendants' motions, that this reason was pretextual. Specifically, Nelson objects to the R&R's conclusion that "PGC conducted at least a good faith investigation." R&R at 30. Nelson states that during the hearing, the PGC only reviewed footage from one of two cameras at the hiring hall where the alleged incident occurred, and Nelson further argues that the R&R erred in stating that Nelson's claim that there was other footage was uncorroborated. Nelson

misidentifies the R&R's reasoning, as the R&R had concluded that Nelson's statement that the other footage was <u>destroyed</u> was unsupported.  R&R at 28 n.21 (citing ECF No. 74-1 at 9, Nelson Decl. ¶ 44).  Indeed, Nelson's own declaration did not state that the footage was destroyed—only that Local 1422 "purposely did not produce that video." Nelson Decl. ¶ 44.  While Nelson cites, in her objections, testimony from other witnesses claiming that there were other cameras in the hiring hall, Nelson's testimony continues to be the only evidence that the footage was purposefully excluded from consideration at the PGC hearing.  More importantly, while Nelson focuses exclusively on the video— arguing that it is inconclusive on whether Smith twisted Nelson's wrist—Nelson ignores the crux of the R&R's finding, which was that the court need not determine whether PGC's reason was necessarily valid, only whether it was based on good faith.  R&R at 29; <u>see also</u> <u>Hawkins v. PepsiCo, Inc.</u>, 203 F.3d 274, 278, 281 n.1 (4th Cir. 2000) (quoting <u>DeJarnette v. Corning, Inc.</u>, 133 F.3d 293, 299 (4th Cir. 1998)) ("[W]hen an employer gives a legitimate, non-discriminatory reason for discharging the plaintiff, 'it is not [the court's] province to decide whether the reason was wise, fair or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.'"); <u>Villa v. CavaMezze Grill, LLC</u>, 858 F.3d 896, 903 (4th Cir. 2017) (citing <u>Richey v. City of Indep.</u>, 540 F.3d 779, 785 (8th Cir. 2008)) ("[W]hen an employer is presented with a 'he said, she said' set of facts involving two employees, and the employer disbelieves the employee and disciplines her, the employer is not liable so long as it took the adverse action because of a good faith belief that the employee made false accusations.").  Based on the evidence on the record, including evidence about the PGC's investigatory process that Nelson failed to address, the court finds that no reasonable juror could conclude,

without impermissibly speculating, that the PGC's proffered reason was not the true reason for suspending Harriman for thirty days.

### 2. 198-Day Suspension

Next, Nelson claims that defendants retaliated against her for requesting accommodations to ride in the front of the work shuttle by preventing Nelson from working for 198 days. The R&R first analyzed whether Nelson could establish the causation element in a prima facie case. The R&R concluded that the suspension was too far removed from her protected activity to establish a causal relationship based on temporal proximity. Nelson objects, arguing that the R&R focused on the wrong protected activity for purposes of the causation analysis. While the R&R deemed the six-month suspension a purportedly retaliatory response to Nelson's protected activities of filing complaints against Snipe and Smalls, Nelson claims that the suspension was retaliation for requesting accommodations. Under Nelson's theory, Riley's instruction barring Nelson from work only occurred approximately two weeks after Nelson sought to ride in the front of the work shuttle. The court finds the R&R's confusion justifiable. Nelson failed to discuss the six-month suspension within the context of retaliation in her motion for summary judgment. See ECF No. 59 at 33–34. Nelson then stated in her response in opposition to defendants' motions that her "retaliation claim first starts with the failure to be selected for work after reporting Mr. Snipe." ECF No. 74 at 27. Nevertheless, the court recognizes that Nelson previously stated that the six-month suspension occurred "two weeks after she requested to ride in the front seat of the shuttle," and the court favorably construes her objection as raising this same point. Id. The suspension and the request for accommodations are "very close" in time such that the

court finds that Nelson has sufficiently established a prima facie case.  See Clark Cnty.

Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (holding temporal proximity between

protected activity and an adverse employment action must be "very close" to establish the

causation prong).  The court thus departs from the R&R in this narrow respect.

Despite finding that Nelson failed to establish a prima facie case, the Magistrate

Judge proceeded to find that Nelson also failed to demonstrate that defendant's proffered

non-retaliatory reason for the suspension was pretextual.  As the R&R noted, after Nelson

provided the note from her psychiatrist, defendants barred Nelson from working out of a

concern for safety.  While Riley was the one who made this initial decision, it reflected

the Port Employers' general concerns as well.  Nelson objects, arguing that the R&R

failed to consider her evidence of pretext.  In doing so, Nelson again cites evidence that

she previously presented in her opposition to defendants' motion for summary judgment.

Specifically, Nelson argues that (1) the chief delegate, Adam McNeil ("McNeil"),

previously allowed Nelson to ride in the front of the work shuttle, (2) Nelson completed

the fitness for duty form and medical release, as requested, to return to work, and (3) the

CBA allows others who engage in conduct that jeopardizes safety to face lesser

suspensions.  Each of these assertions was raised and carefully considered in the R&R.

The only specific objection raised to the R&R is to the Magistrate Judge's finding that

"McNeil was not privy to Defendants' reasons for suspending Plaintiff."  R&R at 34.

However, the court reads the Magistrate Judge's conclusion as a feather in Nelson's cap,

temporarily sustaining her argument that defendants' proffered reason was pretextual

because it challenged McNeil's testimony that he was unsure of why Nelson was being

barred from work after he previously allowed her to ride in the front.  But as the R&R

31

ultimately concluded, the fact that McNeil allowed Nelson to ride in the front of the work shuttle for two weeks before she was suspended is immaterial because that fact is consistent with testimony from others that defendants were awaiting additional information from Nelson's doctor about her medical accommodations. Moreover, the issue of whether McNeil knew the legitimate reason for Nelson's suspension is also immaterial, as there is no requirement that all stakeholders involved must be informed about the proffered reason. Rather, if the legitimacy of the reason is in doubt, courts look to whether the non-retaliatory reason was "actually communicated" to the plaintiff, and there is no dispute that it was here. See Hill v. Nicholson, 383 F. App'x 503, 514 (6th Cir. 2010). In sum, the court adopts the R&R's finding that defendants provided a legitimate, non-retaliatory reason for the six-month suspension, and Nelson failed to provide sufficient evidence that the reason was pretextual.

### 3. Failure to Hire

Lastly, Nelson alleges in her amended complaint that when she reported Snipe for his inappropriate conduct, defendants retaliated against her by not picking her for work. Then, when she reported Smith for skipping her for work and for allegedly grabbing her, defendants further retaliated. Altogether, Nelson claims she was not selected for work in violation of the CBA's seniority rules on April 27, 2017; May 17, 2017; May 19, 2017; May 20, 2017; June 11, 2017; June 25, 2017; May 1, 2019; May 4, 2019; July 19, 2019; and August 19, 2019.

The R&R first analyzed whether Nelson had established a prima facie case, ultimately determining that Nelson failed to show causation. First, the R&R found that

32

there was no evidence that any of the Headers,[8] including the primary Header that Nelson alleges refused to hire her—Smith, had knowledge of Nelson's grievance against Snipe. See also Dowe v. Total Action Against Poverty, 145 F.3d 653, 657 (4th Cir. 1998) ("To satisfy the third element, the employer must have taken the adverse employment action because the plaintiff engaged in a protected activity. Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case."). Nelson objects to this conclusion, arguing that a reasonable juror could conclude that both Smith and other Headers knew about Nelson's grievance against Smith. In the R&R, the Magistrate Judge concluded that Smith did not know Nelson filed a grievance against Snipe because, not only did Nelson present no evidence on the matter, Smith plainly stated in his deposition that he had "no knowledge whatsoever" that Nelson complained about Snipe. ECF No. 56-8, Smith Dep. at 113:3–8. In her objections, Nelson argues for the first time that Smith was untruthful because he previously told the PGC during his hearing that Nelson had a "reputation for -- for taking people upstairs." ECF No. 89 at 22 (citing ECF No. 74-8). Setting aside that Nelson failed to raise this argument in her prior briefs, the court agrees that when viewed in the light most favorable to Nelson, a reasonable juror could conclude that Smith's comment was a reference to knowing that Nelson had previously filed grievances, a protected activity.

---

[8] In its analysis, the R&R assumed, without deciding, that Headers were acting as proxies for Local 1422. The court makes the same assumption for purposes of this argument.

33

"However, knowledge of protected activity is necessary, but not sufficient to prove causation." Miles-Stephens v. N.C. Dep't of Corrs., 2014 WL 3110018, at *6 (E.D.N.C. July 7, 2014) (citations omitted). The R&R further concluded that each of the days that Nelson was allegedly skipped for work occurred more than a year after she filed her grievance, suggesting an attenuated relationship between the events. Nelson objects, arguing that the R&R failed to account for Nelson's time away from work serving her suspensions and taking care of her mental health. The issue is that the burden is on the plaintiff to prove causation, and in the absence of a close temporal proximity, Nelson has not shown any other evidence of causation. See Roberts, 998 F.3d at 123 (explaining that a plaintiff may demonstrate that a protected activity caused an adverse action either through the existence of facts or sufficient temporal proximity). In other words, the existence of a gulf in time between Nelson's complaint and the purported adverse employment action may certainly be explained away, and does not necessarily weigh against Nelson, but Nelson has not buttressed her claim with other evidence of causation. Moreover, Nelson ignores the R&R's finding that she was repeatedly hired by many of the same Headers that she claims retaliated against her, which weighs against finding causation. Instead, Nelson argues that as a sign that Local 1422's proffered reasons were pretextual, the seniority rules were violated on the dates in question, but the court concludes—as the R&R did—that Nelson fails to establish a prima facie case of retaliation and may not proceed beyond the first step of the McDonnell Douglas burden-shifting framework. Since Nelson has failed to meet her burden under the framework for any of the three purportedly retaliatory acts, the court grants summary judgment in defendants' favor on those claims.

## IV.   CONCLUSION

For the foregoing reasons, the court **ADOPTS** the R&R and **GRANTS** Local 1422's motion for summary judgment, **GRANTS** SCSA's motion for summary judgment, and **DENIES** Nelson's motion for summary judgment.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**March 31, 2022**
**Charleston, South Carolina**